UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>INTEGRITY FINANCIAL AZ, LLC,<br>STEVEN R. LONG,<br>STANLEY M. PAULIC,<br>WALTER W. KNITTER, and<br>ROBERT C. KOELLER,<br><br>Defendants. | Case No. |

**COMPLAINT**

Plaintiff, United States Securities and Exchange Commission ("Commission"), alleges:

**SUMMARY**

1. This case involves a securities offering fraud. From at least February 21, 2008 through August 31, 2009, Integrity Financial AZ, LLC ("IFAZ"), through its principals, Steven R. Long and Stanley M. Paulic, and its promoters, Walter W. Knitter

and Robert C. Koeller, fraudulently offered and sold unregistered securities in the form of promissory notes purportedly secured by real estate. The defendants solicited investors to invest self-directed IRA, 401k or other funds into a program ostensibly to build homes in Tonopah, Arizona that would be occupied by renters who would then, through IFAZ efforts, become qualified for mortgages to purchase the homes.

2. In promotional materials, including multiple Web sites, press releases, brochures, newspaper advertisements, and telemarketing scripts, defendants made false and misleading statements and omissions of material facts, including assurances to prospective investors that their investments would be "secured," "low risk," and "non-pooled," and that their investments would be both insured by the Federal Deposit Insurance Corporation ("FDIC") and protected by homeowner's insurance.

3. IFAZ investors received promissory notes guaranteeing interest rates between 10 and 20 percent, and copies of publicly-filed deeds of trusts, each listing a specific property purportedly securing the investor's funds. In reality, only one of the properties that purported to secure investments was owned by IFAZ, and, in any event, the listed properties were worth a fraction of the amount of investments they "secured."

4. Defendants assured investors that 100% of their money would be used to build homes in Tonopah, Arizona when, in fact, only a small fraction of the money raised through the offering went to build IFAZ homes there. The vast majority of investor money went to defendant Long's unrelated real estate interests, commissions and payments to IFAZ's principals and promoters, and Ponzi-scheme-like payments to earlier IFAZ investors.

5. IFAZ investments were not only unsecured, but they bore considerable undisclosed risk. Investors were told that profits from past sales would be placed from the outset in bank accounts in each investor's name covering two-years' worth of interest, when, in fact, the interest payments and the ultimate return of investors' principal was entirely dependent on IFAZ's deteriorating ability to sell homes in an Arizona town hard hit by the local and national real estate recession. Further, despite claims to the contrary, IFAZ had minimal profits, if any, from previously sold homes, and investments were not insured by the FDIC, property insurance, or any other insurance product.

6. Between February 21, 2008 and August 31, 2009, defendants raised more than $8 million from at least 58 investors nationwide. Over 30 of those investors reside in the Northern District of Ohio.

7. By engaging in the conduct described in this complaint, defendants have engaged, and unless restrained and enjoined by this Court, will continue to engage, in acts and practices that constitute and will constitute violations of the federal securities laws, including Sections 5 and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(c) and 77q(a)], Sections 10(b) and 15(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

8. The Commission requests that the Court: (1) enter permanent injunctions restraining and enjoining defendants from further violations of the above-cited provisions; (2) order defendants to disgorge an amount equal to the funds and benefits they obtained illegally, or to which they were not entitled, plus prejudgment interest on

that amount; (3) order defendants to pay civil money penalties; and (4) provide any other appropriate relief.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. IFAZ, Long, Paulic, Knitter, and Koeller, directly and indirectly, made use of the means and instrumentalities of interstate commerce, the means and instruments of transportation and communication in interstate commerce, and the mails, in connection with the acts, practices, and courses of conduct complained of herein.

10. Personal jurisdiction and venue are proper in the Northern District of Ohio because many of the defendants' illegal acts and transactions occurred in this District.

## DEFENDANTS

11. **Integrity Financial AZ, LLC** is a limited liability corporation registered in the State of Arizona and owned by defendants Steven R. Long and Stanley M. Paulic. Its headquarters and principal place of business is 9521 Folsom Boulevard, Suite R, Sacramento, California. IFAZ has recruited investors through various means since at least the second quarter of 2008 through Web sites, press releases, personal solicitation, brochures, investment seminars, and newspaper, radio, and video advertising. IFAZ is not registered with the Commission in any capacity. IFAZ acted as an unregistered broker from at least February 2008 until at least August 31, 2009.

12. **Steven R. Long**, 49, is a resident of Mather, California. He is the president, co-founder and 51% owner of IFAZ. Long is not registered with the

Commission in any capacity. Long controlled IFAZ and more than a dozen bank accounts used by IFAZ and other businesses he controlled.

13. **Stanley M. Paulic**, 37, is a resident of Aurora, Ohio and Lakeland, Florida. He is the chief executive officer, co-founder, and 49% owner of IFAZ. Paulic is not registered with the Commission in any capacity. Paulic acted as an unregistered broker from February 2008 until at least August 31, 2009, acting as the principal recruiter of investors with IFAZ. He recruited clients from his prior insurance and annuity investment book of business, friends and family in Northern Ohio, and persons affiliated with St. Paul's Croatian Church in Cleveland.

14. **Walter W. Knitter**, 52, is a resident of Wheaton, Illinois. He was a promoter with IFAZ whose principal function was to hire, train, and supervise salesmen who recruited investors who contacted IFAZ through various Web sites. Knitter is not registered with the Commission in any capacity. Knitter acted as an unregistered broker from January 2009 until at least August 31, 2009, coordinating leads and personally soliciting investors. Knitter has been the subject of at least two cease-and-desist orders issued by state securities regulators in Wisconsin and Ohio for selling unregistered securities (9-month promissory notes).

15. **Robert C. Koeller**, 45, also known to IFAZ investors as Bob Coller, is a resident of Poplar Grove, Illinois. He was an IFAZ promoter whose principal function was to recruit investors. Koeller is not registered with the Commission in any capacity. Koeller acted as an unregistered broker from March 2009 until at least August 31, 2009.

## FACTUAL ALLEGATIONS

### I. The IFAZ Investment Program

16. Defendants Long and Paulic co-founded the IFAZ investor program in February 2008. According to promotional materials that they prepared, 100% of IFAZ investor funds would be used to buy land and build homes in Tonopah, Arizona, a rural town about 55 miles west of Phoenix. The homes then were to be rented to "deserving" families, who hoped to own a home, but could not qualify for a mortgage because of poor credit. According to promotional materials, IFAZ would help the families improve their credit scores and obtain a mortgage to buy the house. The profits on the sale of houses purportedly were used to pay IFAZ investor returns.

17. From March 12, 2008 through August 28, 2009, IFAZ investors each regularly received two documents evidencing his or her investment: a promissory note and a deed of trust. The promissory note contained IFAZ's unconditional promise to (1) return the investor's principal in full by a date certain within 24 months of the execution of the note and (2) pay a specified yearly interest rate set between 10 and 20%. Each deed of trust listed a property that purportedly secured the investment.

18. From February 2008 through August of 2009, IFAZ raised more than $8 million from at least 58 investors nationwide. More than 30 of those investors reside in the Northern District of Ohio, including parishioners of St. Paul's Croatian Church in Cleveland. Of the $8 million raised, about $1.6 million was paid back to 19 investors, most of whom reinvested in the unregistered securities. As a result, the net amount of proceeds from investors was about $6.4 million.

19. Defendants Knitter and Koeller were promoters for IFAZ, compensated to recruit investors, including those who contacted IFAZ through a 1-888 phone line and those culled from leads generated by the IFAZ Web sites. Knitter and Koeller

successfully converted at least a dozen prospects into IFAZ investors, including at least two from Northern Ohio.

## II. **Defendants Offered and Sold Unregistered Securities to Investors**

20. Neither IFAZ nor any of its offerings was registered with the Securities and Exchange Commission.

21. From February 2008 through August 2009, IFAZ's Web site had a prominent homepage that promised prospective investors "10% Interest on YOUR MONEY!" such that "Your investment is SECURED!" and noted that "you are investing in Integrity Financial AZ LLC not Real Estate properties." Defendant IFAZ identified itself as a "private investment firm that is in the top 1% nationally" and that "recognized an opportunity to join investors with new home owners in a safe environment [such] that investors will enjoy high rates of return year after year."

22. IFAZ, through the efforts of defendants Paulic and Knitter, embedded key words in its Web site specifically to attract prospective investors who might run searches in search engines, including the terms "High Yield Investment," "High Profit Investment," "High Investment ROI," "Investment Opportunity," "Investment Advice," "Hedge Fund," "High Returns," and "10% APR Paid Monthly Alternative Investments."

23. IFAZ promotions were designed to lure investors interested in earning a significant fixed rate of return on their investment, with their principal to be returned to them after earning interest.

24. IFAZ urged prospective investors to use IRA, 401k, and other retirement savings, promising that the IFAZ offering is "401K Qualified" and urging investors to create self-directed IRAs to "[s]top your losses in your portfolio and start making 10%

APR on your retirement dollars." Investors were further urged to "Remove yourself from the market volatility and grow with stability."

25. IFAZ securities were offered and sold to a broad segment of the public, and most of the securities were sold to individuals.

26. IFAZ's investors' funds were pooled and purportedly used by IFAZ to fund its real estate operation. Although IFAZ investors received individualized notes purportedly secured by deeds of trust listing only one property securing each investment, investor funds were, in fact, pooled with other investors' funds in one of two business accounts, then used for multiple purposes, including real estate interests unrelated to IFAZ. In fact, properties listed on deeds of trust were often vacant land or homes with insufficient value to secure the investor funds assigned to them.

27. IFAZ's offering was at no time exempt from registration under the federal securities laws.

28. Through the methods and tactics described herein, IFAZ, Long, Paulic, Knitter, and Koeller frequently and actively recruited members of the public to invest in IFAZ, and they offered advice to such investors. The defendants thus induced and attempted to induce the purchase or sale of investments in IFAZ.

29. IFAZ, Long, Paulic, and Knitter were not registered with the Commission as brokers or licensed as associated persons of a registered broker-dealer.

30. Koeller was a registered representative with a broker-dealer until June 15, 2009, but was unsupervised by that broker-dealer with regard to his IFAZ sales, and was not a registered representative of any broker-dealer after that date.

31. Paulic, Knitter, and Koeller received commissions of between 3 and 10 percent of the value of the IFAZ promissory notes they sold.

32. Long used portions of the proceeds received from IFAZ investors to fund other businesses in which Long also sold investments.

33. Long and Paulic were controlling persons of IFAZ and therefore responsible for IFAZ's failure to register as a broker-dealer.

## III. Defendants Made Fraudulent Misrepresentations and Omissions of Material Facts to Investors

34. From January 2008 through August 2009, defendants employed multi-media solicitation tools to attract investors to the IFAZ offering and made numerous false and misleading statements and omissions of material fact, most notably relating to the secured nature of the investment, the use of the investors' principal, the source and manner in which interest is paid, and the timeframe and risk attendant to an investor receiving his or her principal back. These material misrepresentations and omissions included, but are not necessarily limited to, the following:

### A. IFAZ Offering Document

35. In January 2008, defendants Long and Paulic wrote IFAZ's "offering" document, which was then e-mailed, mailed, or hand-delivered to prospective investors through August 2009.

36. The offering document contained numerous false and misleading statements and omissions of material fact, including the misrepresentations that "Integrity Financial owns the land and builds a new home with private investor's capital," that the "private investor's money, 100% of it, is used towards this individual home or Parcel ID," and that "Integrity Financial's Custodial account at Bank of America contains

deposits from gross profits of previously sold homes or tenant-converted-to-owner sales [and] the monthly interest payments sent to the private investor come directly from that bank account, not from new private investor's investment capital."

37. The above representations were false and misleading because, except for one property, IFAZ did not own the land on which homes were built (the land was owned primarily by defendant Long); 100% of investors' money was not used to build homes (in fact, only a small portion of the money was used to build homes); no custodial accounts were created in the name of investors; and IFAZ had little or no profits from previously sold homes with which to make investors' interest payments.

38. IFAZ, Long, and Paulic e-mailed, mailed, or hand-delivered the offering document directly to prospective investors and incorporated its content in subsequent promotions between February 2008 and August 2009, including the IFAZ Web sites.

39. Beginning in January 2009, Knitter instructed his salesmen to e-mail, mail, or hand-deliver the offering document to prospective investors and incorporated and revised its contents in other promotions, including later iterations of the IFAZ Web sites and his telemarketing script.

40. IFAZ, Long, Paulic, and Knitter knew, or were reckless in not knowing, that the offering document contained false and misleading statements and omissions of material fact.

**B. <u>IFAZ Web Sites</u>**

41. Beginning in or around January 2008, Long and Paulic created, operated, and oversaw Web sites available to the public on the Internet, including the following sites: www.integrityfinancialllc.com, www.integrityfinancialtd.com,

www.integrityfinancialaz.net, and www.ifazllc.com. These Web sites advertised and solicited investment in IFAZ. Long and Paulic supplied the content, including content drawn from the IFAZ offering document described above.

42. Defendant Knitter edited, revised, or contributed to the IFAZ Web sites beginning in January 2009 and worked to make the sites more closely targeted at Internet search engines. In conjunction with that, he developed a search engine "pay-per-click" campaign in which IFAZ's Web site would embed hidden text that would draw users who typed particular search terms, including "investment opportunities," "high yield investment," "hedge funds" and other key words.

43. The Web sites included false and misleading statements and omissions of material fact, including but not necessarily limited to, those discussed below. Long, Paulic, and Knitter knew, or were reckless in not knowing, that the Web sites contained materially false and misleading statements and omissions of material fact.

**1. Secured Investment**

44. The homepage of the IFAZ Web site assured prospective investors "Your investment is SECURED. You will receive a Deed of Trust on a new home with an established occupant . . . . The Deed of Trust is what we utilize to secure your investment as additional protection." It further stated that "No more than 90% of the new home is used to secure Trust Deeds to private investors."

45. These representations were false because many of the properties listed in the deeds of trust investors received were either vacant land or homes with assessed values far below the amount of investments they purportedly secured.

**2. Ownership and Use of Investor Funds**

46. Another material misrepresentation on the IFAZ Web sites between February 2008 and August 2009 was their proclamation that "Integrity Financial owns the land and builds a new home with private investor's capital. Individual notes are created in favor of investors on a "non-pooled" basis. A buyer is already slated for the home. The private investor's money, 100% of it, is used towards this individual home or Parcel ID."

47. In fact, IFAZ did not own land, except for one property. Most of the properties were owned by defendant Long and his wife as community property, or by investors who participated in a separate, earlier offering called Investor 500.

48. Further, the private investors' money was not devoted 100% to an individual home or parcel, but was instead placed into one of two pooled business accounts where it was used, among other ways, to fund real estate interests unrelated to IFAZ, to make payments to IFAZ principals and promoters, and to pay earlier IFAZ investors.

49. Often, the property identified in the investor's deed of trust was vacant desert land with minimal value.

50. Additionally, commissions of up to 20% were paid from investors' funds to defendants Knitter, Koeller, and Paulic – amounts which further prevented each investor's investment from being used, 100%, toward a particular property.

### 3. <u>Interest Payments</u>

51. Another material misrepresentation in the IFAZ Web site homepage between February 2008 and August 2009 was its promise that "Integrity Financial will

deposit your 24 months of interest from existing profits into a sub-account in your name with Bank of America."

52. In fact, IFAZ did not open any accounts in investors' names at any bank, nor has it generated "profits" sufficient to cover investors' monthly interest payments.

53. IFAZ has converted few if any renters to buyers since its inception, and whatever "profits" were generated from such sales fell far short of the more than $900,000 in interest payments that have been paid to IFAZ investors through September 2009.

54. Consequently, IFAZ used other funds, including newer investors' funds and proceeds from an unrelated real estate investment program to meet its monthly obligations.

### 4. Risk of Investment

55. Another material misrepresentation on the IFAZ Web sites between March 2008 and August 2009 was their claim that: "Integrity Financial qualifies the buyer for a mortgage (credit counseling, better employment through an affiliate, etc.) The buyer is of no risk to the investor. Buyer receives the mortgage. After the closing of the mortgage, the investor receives the principle [sic] back and releases the Deed of Trust per the Contract Agreement . . . . A twenty four month contract agreement gives a 100% safety factor for the tenant to owner conversion process."

56. The IFAZ Web sites' representations were false because, as noted above, the return of principal and the payment of interest depended entirely on IFAZ's ability to locate a buyer or convert a renter to a buyer of a home in Tonopah, Arizona -- something it has rarely if ever done.

57. IFAZ also assured prospective investors that their "interest is FDIC insured [and] [u]nlike other programs, your principle [sic] is also protected by homeowner's insurance." Those claims were not true, and in fact, no insurance program or insurance product protected investments in IFAZ.

58. The Web site also claimed that IFAZ only uses 90% of the value of a home to secure trust deeds. In fact, IFAZ actually left investors functionally unsecured, using properties with an aggregate value of less than $950,000 to "secure" $6.4 million of IFAZ investor funds. Further, only one of seventeen properties purportedly securing investor funds was actually owned by IFAZ, even though IFAZ was listed as the trustor on each of the deeds of trust investors received.

**5. Miscellaneous Web Misrepresentations**

59. In addition to the material misrepresentations described above, IFAZ's Web sites, which were drafted, edited, and overseen by defendants Long, Paulic, and Knitter, were riddled with untrue and deceitful statements and omissions of material fact designed to attract investors to IFAZ, including the following:

60. From February 2008 through August 2009, the IFAZ Web sites boasted that IFAZ had a staff of 13 employees and included a corporate structure flow chart that showed seven subsidiaries, including mortgage, realty, and construction firms. In fact, most of the "employees" listed for IFAZ were employed, if at all, by other entities. and the seven subsidiaries listed in the flow chart were all essentially alter-egos of defendant Long and merely an accounting mechanism he employed to keep separate bank accounts for various purposes.

61. From February 2008 through August 2009, IFAZ's Web site included a section drafted and edited by Long, Paulic, and Knitter titled "Homeowner's Bios" [sic] that included photos of smiling "Deserving Families" standing in front of IFAZ homes, accompanied by glowing testimonials such as "Thanks to Integrity Financial and the affordable programs they had to offer me, I was able to make my dreams come true." This promotion was deceptive because, in fact, none of the four families depicted on the Web site was a "homeowner."

62. From February 2008 through August 2009, the IFAZ Web site boasted that "Integrity Financial builds new homes at a rate of 5 new homes per month . . . . [and] Integrity Financial is increasing their production by 100 percent. We will be building ten homes a month by the end of the year." These representations were false. IFAZ completed its last home, at the latest, in May of 2009. and there are currently no homes under construction. IFAZ never built 5 homes in a month, let alone 10.

63. Another material misrepresentation on IFAZ's Web site from February 2008 through August 2009 was its claim that "[t]he average sale price is $300,000.00 to $330,000.00." That claim was false. The only home that IFAZ ever sold had a sale price of $260,000, and the assessed values of homes securing IFAZ investors ranged from $15,500 to $146,000 in 2009.

**C. <u>IFAZ Press Releases</u>**

64. Long and Paulic drafted and/or approved at least four press releases that were published for IFAZ between November 14, 2008 and February 17, 2009.

65. These press releases included material misrepresentations, including but not necessarily limited to representations that IFAZ investors would earn "10%

contractually guaranteed," that investors have "separate and distinct accounts," and that IFAZ was able to open "a new communications office even in Wall Street's darkest hour."

66. These representations were false because IFAZ investors' returns were not guaranteed, but rather precariously linked to Long's ability to sell homes in Arizona; investors had no separate and distinct accounts; and IFAZ never opened a communications office.

67. Defendants Long and Paulic knew, or were reckless in not knowing, that the press releases contained false and misleading statements and omissions of material fact.

### D. IFAZ Brochures and Investment Seminar

68. Defendants Long and Paulic hosted an investor seminar for IFAZ on April 2, 2009 at the Hilton Cleveland/East Hotel in Beachwood Ohio. The seminar was attended by 20 to 30 prospective investors.

69. At the seminar, defendants Paulic and Long distributed a glossy brochure that included false and misleading statements and omissions of material fact, including but not necessarily limited to those discussed below. The brochure distributed by Long and Paulic included a bogus list of IFAZ investor "references." In fact, none of those individuals was an actual IFAZ investor.

70. The brochure also noted that IFAZ "assures the monthly payment to its investors" noting that the "[a]mount in reserve is greater than five years of payments owed." The brochure also touted a mortgage subsidy program to make homeownership

more affordable and assured investors that "The money for a mortgage subsidy comes from profits."

71. As noted above, those claims are false and misleading because IFAZ generated minimal or no profits. Further, for IFAZ to continue making interest payments to investors it would have had to sell homes or to use funds from newer investors. Finally, IFAZ did not keep five years of investors' interest payments in reserve.

72. Defendants IFAZ, Long, and Paulic knew, or were reckless in not knowing, that the IFAZ brochure contained false and misleading statements and omissions of material fact.

**E. <u>Purported Audited Financial Statements</u>**

73. From January through May 2009, defendants IFAZ, Long, Paulic, and Knitter created financial statements that misrepresented IFAZ's financial condition, with the express purpose of recruiting new investors.

74. In April 2009, Long commissioned purported "audited financials" from a non-CPA accountant with an office in the same building as Long's office. These financials were not prepared in accordance with generally accepted accounting principles, and they were not audited using generally accepted auditing standards. Additionally, the financials included a purported profit and loss statement and balance sheet that included income, expenses, and assets of several entities not related to IFAZ.

75. Defendants Paulic and Knitter also collaborated on creating financial statements for IFAZ in February and March 2009 and helped distribute to prospective investors the "audited financials" that Long commissioned in April 2009. Ultimately, at the direction and supervision of Paulic and Knitter, IFAZ salesmen including Koeller e-

mailed, mailed, or hand-delivered the financial statements to prospective investors, noting "You can see we are very profitable" and "IFAZ LLC made over $800,000 last year with all that happened in the markets."

76. Defendant Long knew, or was reckless in not knowing, that the purported "audited financials" were false and misleading and that they included financial results for entities not related to IFAZ. Defendants Paulic, Knitter, and Koeller knew, or were reckless in not knowing, that the financials were false and misleading.

**F. <u>Other Material Misrepresentations</u>**

77. Defendant Knitter wrote a telemarketing presentation for IFAZ in January and February 2009 that contained false and misleading statements and omissions of material fact about IFAZ, such as statements that "[y]ou will receive a recorded deed of trust on a home that is finished and occupied," "[y]our interest will be deposited in a bank account in your name," "[e]very investor resigns for another contract," and "your money is secured, your interest is FDIC insured." This script was then used by salesmen that Knitter supervised, and the representations were verbally made to prospective investors.

78. Knitter either knew, or was reckless in not knowing, that the telemarketing presentation included false and misleading statements and omissions of material fact.

79. From February 2008 through August 2009, IFAZ's Web site touted "specialized programs like the Disabled Veteran Program" that purported to help disabled veterans achieve homeownership. Defendants Long and Paulic drafted and edited this content on the Web site, and Defendant Knitter also touted the Disabled Veterans Program in a telemarketing script he wrote for salesmen in January and February 2009. This seemingly patriotic promotional item was deceptive because, in fact, no disabled

veteran ever took part in any IFAZ program. Defendants Long, Paulic, and Knitter knew, or were reckless in not knowing, that such statements were false and misleading.

80. Knitter also drafted and placed print advertisements for IFAZ between March and July 2009 in publications, including the Sun City Lifestyles magazine and the Glen Ellyn (Illinois) Sun. Those ads included material misrepresentations, including that IFAZ investments were "secured," that the offer ends at a date certain, and that IFAZ "is in the top 1% of Private Investment Firms." Knitter knew, or was reckless in not knowing, that these statements were deceptive.

81. On May 20, 2009, defendant Paulic published an advertisement for IFAZ in the Cleveland Plain Dealer, characterizing the IFAZ offering as a "private REIT," or real estate investment trust. This ad was deceptive because, in fact, IFAZ is neither a REIT nor a trust of any sort.

82. From March to August 2009, IFAZ salesmen working for defendant Knitter, including defendant Koeller, also made material verbal misrepresentations to investors and prospective investors such as claims that IFAZ is a "private non registered REIT," that investors' "Interest is FDIC insured," and that "You earn 10% guaranteed without any risk to your principal." Defendants Knitter and Koeller knew, or were reckless in not knowing, that the verbal representations included false and misleading statements and omissions of material fact.

83. From March to August 2009, defendant Koeller followed up with prospective investor leads provided by Knitter and, in doing so, made numerous verbal and written misrepresentations to prospective investors using information provided by

Knitter, including that IFAZ had been awarded a contract by the State of Arizona. In July 2009, for example, Koeller e-mailed a prospective investor:

> [W]e received word yesterday that the State of Arizona is going to [be] hiring us to build a new [$]70,000,000.00 manufacturing facility. We are also going to be working with the state on a jobs creation program as well as a new home initiative for the job participants to purchase homes thru [I]ntegrity [F]inancial. We are the exclusive builder who participates in the program with the state. The biggest and greatest news is the state [sic] of Arizona is going to be guaranteeing all mortgage payments to our company on behalf of the new home owners as well as guaranteeing all investment dollars [from] new investors. We now have a product that is 100% backed and guaranteed by the full faith and credit of the state of Illinois. [sic]

Each assertion in the e-mail is fictitious. Koeller knew, or was reckless in not knowing, that these representations were false.

84. Knitter was aware that Koeller was telling prospective investors about the supposed contract with the State of Arizona. Knitter knew, or was reckless in not knowing, that the representations made to investors about an IFAZ contract with the State of Arizona contained false and misleading statements and omissions of material fact.

85. Koeller also wrote materially misleading e-mails to prospective investors in May and June 2009, writing that the IFAZ offering is a "private non registered REIT," that investors' "Interest is FDIC insured," and that "You earn 10% guaranteed without any risk to your principal." Koeller knew, or was reckless in not knowing, that the statements included false and misleading statements or omissions of material fact.

## IV. Defendants Profited from Their Fraud

86. Defendant Long used most of IFAZ investor money to fund another investment program, to pay commissions to IFAZ salesmen, and to make payments to earlier IFAZ investors. He also paid himself – receiving net payments of at least

$535,000 from March to December 2008 and $279,000 in 2009 from IFAZ investors' funds filtered through Long's non-IFAZ bank accounts and businesses. During this period, these non-IFAZ businesses either directly or indirectly received net cash transfers of nearly $4.3 million from IFAZ, part of which was used to make the payments to Long alleged above. Additionally, IFAZ investor money was used to help pay at least $559,000 in credit card charges incurred by Long or his businesses.

87. Defendant Paulic took commissions of between three and eight percent of the value of the IFAZ investments he brought in. Paulic received net payments from IFAZ of at least $360,000 in 2008 and $225,000 in 2009, and received a partnership draw in the form of an interest-free loan in the amount of $150,000 on October 28, 2008. He repaid the loan in August 2009 after SEC investigative staff questioned him about it.

88. Defendants Knitter and Koeller raised at least $900,000 from IFAZ investors, and they split a 20% commission on investor funds. Knitter began his work for IFAZ sometime in late January 2009, and Knitter hired Koeller in or around March 2009.

89. Knitter has received payments of at least $105,000 from IFAZ investor funds since January 2009, including $10,000 to develop marketing materials for IFAZ.

90. Koeller has received payments of at least $87,000 from IFAZ investor funds since March of 2009. At Koeller's request, those payments were made by IFAZ to a third party.

## FIRST CLAIM
## VIOLATIONS OF SECTION 17(a) OF THE SECURITIES ACT

91. Paragraphs 1 through 90 are realleged and incorporated by reference as if set forth fully herein.

92. Defendants, in the offer and sale of the securities described above, by the use of means and instruments of transportation and communication in interstate commerce, and by use of the mails, directly and indirectly, knowingly or recklessly have (a) employed devices, schemes, or artifices to defraud; (b) obtained money and property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices, or courses of business which operated as a fraud and deceit upon purchasers of securities.

93. By this conduct, Defendants each violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM
## VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 THEREUNDER

94. Paragraphs 1 through 90 are realleged and incorporated by reference as if set forth fully herein.

95. Defendants, directly and indirectly, in connection with the purchase and sale of securities, by the use of means and instrumentalities of interstate commerce, and of the mails, knowingly or recklessly have (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under

which they were made, not misleading; or (c) engaged in acts, transactions, practices, and courses of business which operated as a fraud or deceit upon any person.

96. By the conducted described above, each of the Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder.

**THIRD CLAIM**
**VIOLATIONS OF SECTION 5 OF THE SECURITIES ACT**

97. Paragraphs 1 through 90 are realleged and incorporated by reference as if set forth fully herein.

98. Defendants, directly and indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer or offer to sell securities, through the use or medium of a prospectus or otherwise, when no registration statement had been filed or was in effect as to such securities.

99. By this conduct, each of the Defendants violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e (a) and (c)].

**FOURTH CLAIM**
**VIOLATIONS OF SECTION 15(a)(1) OF THE EXCHANGE ACT**

100. Paragraphs 1 through 90 are realleged and incorporated by reference as if set forth fully herein.

101. Defendants, while not registered as brokers or dealers under Section 15(b) of the Exchange Act, made use of the mails or means of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, securities.

102. By this conduct, each of the Defendants violated Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter final judgments in favor of the Commission and against each of the Defendants, and providing the following relief:

1. Permanently enjoining each of the Defendants, their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating Sections 5 and 17(a) of the Securities Act [15 U.S.C. §§ 77e and 77q(a)] and Section 10(b) and 15(a)(1) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78(o)(a)(1)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder.

2. Ordering disgorgement by Long and IFAZ, jointly and severally, with prejudgment interest thereon, and disgorgement by Paulic, Knitter, and Koeller, with prejudgment interest thereon.

3. Ordering Defendants to each pay a monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. 78u(d)(3)].

4. Ordering such other and further relief as this Court may determine to be just and necessary.

Dated: April 15, 2010

Respectfully submitted,

/s/ David J. Gottesman

David J. Gottesman
Assistant Chief Litigation Counsel
United States Securities and

Exchange Commission
100 F Street NE
Washington, DC 20549-4030
Phone: (202) 551-4470
Fax: (202) 772-9245
Email: gottesmand@sec.gov
Attorney for Plaintiff

Of Counsel:
Scott W. Friestad
David Frohlich
Melissa A. Robertson
Thomas D. Manganello
U.S. Securities and Exchange Commission