UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES SECURITIES | ) | Case No.: 1:10 CV 782 |
| AND EXCHANGE COMMISSION, | ) | |
| | ) | JUDGE SOLOMON OLIVER, JR. |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| INTEGRITY FINANCIAL AZ, LLC, *et al.*, | ) | |
| | ) | |
| Defendants | ) | ORDER |

Currently pending before the court in the above-captioned case is Plaintiff, United States Securities and Exchange Commission's ("Plaintiff" or "SEC") Motion for Order Granting Financial Remedies to the SEC, and for Entry of Final Judgment Against Defendant Robert C. Koeller ("Koeller").  (ECF No. 71.)  Koeller requests oral argument.  However, in light of the papers submitted, the court finds that the arguments are clearly set out, and there is no basis for oral argument.  For the reasons stated herein, the court grants Plaintiff's Motion.

## I.  FACTS AND PROCEDURAL HISTORY

### A. Procedural History

On April 15, 2010, Plaintiff filed a complaint against Defendants, Integrity Financial AZ, LLC ("IFAZ"), Stephen R. Long ("Long"), Stanley M. Paulic ("Paulic"), Walter Knitter ("Knitter"), and Koeller (collectively, "Defendants"), alleging Defendants fraudulently offered and sold unregistered securities in the form of promissory notes purportedly secured by real estate. (Comp.

¶ 1, ECF No. 1.) Specifically, Plaintiff alleges that Defendants engaged in activity that violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] (Count I); Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5] (Count II); Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)] (Count III); and Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)] (Count IV). (*Id.*, ¶ 7, ECF No. 1.)

On September 24, 2010, Plaintiff reached a settlement with Defendant Knitter (ECF No. 29), and a final consent judgment, pursuant to Fed. R. Civ. P. 54(b), was entered in favor of Plaintiff on October 29, 2010. (ECF No. 32.) On September 6, 2011, default judgment was entered against IFAZ. (ECF No. 60.) On November 23, 2011, the court granted Plaintiff's Motion for Summary Judgment (ECF No. 72) and entered a final judgment, pursuant to Fed. R. Civ. P. 54(b), against Defendants Long and Paulic. (ECF Nos. 73, 74.)

In June of 2011, Plaintiff entered into a bifurcated settlement with Koeller, in which he agreed to the non-monetary relief sought by Plaintiff ("Koeller Consent"), but which allowed for a later resolution of Plaintiff's claim for financial remedies. (ECF No. 64.) After lengthy discussions regarding Defendant's "alleged inability to pay significant sums," Plaintiff concluded that settlement of the financial remedies was not possible. (Mot. at 7, ECF No. 71-1.) Plaintiff asserts that Koeller submitted documents and information, but Plaintiff found his submissions to be materially deficient. (*Id.* at 9.) Under the terms of the settlement agreement, Plaintiff is permitted to request that the court determine the appropriate financial remedies to be awarded to it. (*Id.* at 7.) The Koeller Consent also provides for the payment of prejudgment interest on the disgorgement amount. (*Id.* at 10.) Furthermore, Koeller stipulated in the settlement agreement that, for the purposes of this Motion, all

-2-

allegations in Plaintiff's Complaint are deemed true, and he can neither contest them nor deny he

violated the securities laws.  (*Id*. at 8.)  The Koeller Consent provides:

> Defendant [Koeller] further agrees that in connection with the Commission's motion for disgorgement and/or civil penalties, and at any hearing held on such a motion: (a) ***Defendant will be precluded from arguing that he did not violate the federal securities laws as alleged in the Complaint***; (b) Defendant may not challenge the validity of this Consent or the Judgment; (c) solely for the purposes of such motion and any hearing or proceedings related thereto, ***the allegations of the Complaint shall be accepted as and deemed true by the Court***; and (d) the Court may determine the issues raised in the motion on the basis of affidavits, declarations, excerpts of sworn deposition or investigative testimony, and documentary evidence, without regard to the standards for summary judgment contained in Rule 56(c) of the Federal Rules of Civil Procedure. In connection with the Commission's motion for disgorgement and/or civil penalties, the parties may take discovery, including discovery from appropriate non-parties.

(Koeller Consent at ¶ 5, ECF No. 64-1 (emphasis added).)

Plaintiff asserts that Koeller received commissions of $87,379 for his wrongful conduct.  As

a result, it seeks two types of financial remedies: (1) disgorgement in the amount of $87,379 in ill-

gotten gains that Koeller received as a result of his violations of the securities laws, plus prejudgment

interest of $4,454.72; and (2) imposition of a civil money penalty against Koeller in the amount

equal to his ill-gotten gains ($87,379).  (Mot. at 8, ECF No. 71-1.)

**B. Facts**

1. Overview of Fraud

Because Koeller's Consent agreement requires the court to accept the allegations in the

Complaint as true, the facts relating to liability are essentially undisputed.  Although Koeller, in his

Opposition, disputes the allegations, those arguments are irrelevant in light of his previous

agreement, which he signed and his attorney approved.  Koeller's circumstances are similar to those

of the defendant in *SEC. v. Universal Exp., Inc.*, 646 F. Supp.2d 552, 558 (S.D.N.Y. 2009), wherein the court stated:

> although he began this litigation with the right to have a trial at which the Court would hear witnesses and decide the relevant facts, including drawing any reasonable inferences and assessing culpability, he relinquished that right when he chose [to] settle the case on terms that explicitly avoided trial, and when he agreed that, for purposes of this Motion, the Court would treat the allegations in the complaint as proven.

The Complaint alleges a fraudulent securities offering by IFAZ. (Compl. ¶ 1, ECF No. 1.) Defendants collectively raised more than $8 million from at least 58 investors nationwide, most of whom reside in this district. (*Id*. at ¶ 6.) The fraud involved offering and selling investments in IFAZ, supposedly secured by deeds of trust on land in Tonopah, Arizona. (*Id*. at ¶ 1.) Defendants asserted that investors would earn annual interest between 10 and 20 percent, and that such investments were secure and low risk. (*Id*. at ¶¶ 2-3.) These statements were false. Only one of the properties that purported to secure investments was owned by IFAZ, and the listed properties were worth a fraction of the amount of the investments they secured. (*Id*. at ¶ 3.)

Koeller, also known to IFAZ investors as Bob Coller, was an IFAZ promoter whose principal function was to recruit investors. (*Id*. at ¶ 15.) He is not registered with the Securities and Exchange Commission in any way, and acted as an unregistered broker from March of 2009 until at least August 31, 2009. (*Id*.)

From March to August of 2009, Koeller "made material verbal misrepresentations to investors and prospective investors such as claims that IFAZ is a 'private non registered REIT,' that investors' 'Interest is FDIC insured,' and that 'You earn 10% guaranteed without any risk to your principal.'" (*Id*. at ¶ 82.) Koeller "knew, or [was] reckless in not knowing, that the verbal

-4-

representations included false and misleading statements and omissions of material fact." (*Id.*)

From March to August of 2009, "Koeller followed up with prospective investor leads provided by [Walter] Knitter and, in doing so, made numerous verbal and written representations to prospective investors using information provided by Knitter, including that IFAZ had been awarded a contract by the State of Arizona." (*Id.* at ¶ 83.) For example, in July of 2009, Koeller e-mailed a prospective investor that:

> [W]e received word yesterday that the State of Arizona is going to [be] hiring us to build a new [$]70,000,000.00 manufacturing facility. We are also going to be working with the state on a jobs creation program as well as a new home initiative for the job participants to purchase homes thru [I]ntegrity [F]inancial. We are the exclusive builder who participates in the program with the state. The biggest and greatest news is the state [sic] of Arizona is going to be guaranteeing all mortgage payments to our company on behalf of the new home owners as well as guaranteeing all investment dollars [from] new investors. We now have a product that is 100% backed and guaranteed by the full faith and credit of the state of Illinois. [sic]

(*Id.*) Koeller knew, or was reckless in not knowing, that these representations were false. (*Id.*)

Koeller received commissions totaling $87,379 from investment funds of investors that he solicited for IFAZ. (*Id.* at ¶¶ 88, 90; Ex. 2, ECF No. 71-4.)

### 2. Violation of Anti-Fraud Provisions of the Exchange and the Securities Act

The Complaint establishes that Koeller violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. A violation of Section 17(a) occurs when, through offering and selling securities, "by the use of means and instruments of transportation or communication in interstate commerce or by the use of mails, directly or indirectly," a defendant knowingly or recklessly (a) employs devices, schemes, or artifices to defraud; (b) obtains money or property by means of untrue

-5-

statements of material facts and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engages in transactions, practices, or courses of business which operated as a fraud and deceit upon purchasers of securities. 15 U.S.C. § 77q(a).  A violation of Section 10(b) and Rule 10b-5 occurs when, "[i]n connection with the purchase and sale of securities, by the use of means and instrumentalities of interstate commerce, and of the mails," directly or indirectly, a defendant knowingly or recklessly (a) employs devices, schemes, or artifices to defraud; (b) makes untrue statements of material fact or omits to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engages in acts, practices, and courses of business which operated as a fraud or deceit upon any person. 15 U.S.C. § 78j(b); 17 C.F.R. §240.10b-5.

To successfully demonstrate a violation of Section 17(a), Section 10(b), and Rule 10b-5, a plaintiff must show that defendant (1) misrepresented or omitted material facts (2) made in connection with the offer, sale, or purchase of securities (3) with scienter on the part of the defendant. *SEC v. Bravata,* 763 F.Supp.2d 891, 916 (E.D. Mich. 2011); *SEC v. George*, 426 F.3d 786, 792 (6th Cir. 2005). The Sixth Circuit has stated that "[s]cienter may be established by proof of recklessness-highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *George*, 426 F.3d at 792 (internal quotation and citation omitted).  The Complaint establishes the elements of the claims against Koeller.  It alleges that he made misrepresentations or omissions of material fact in connection with the offer, sale, or purchase of securities with scienter, or at least recklessness.  The Complaint asserts that Koeller "fraudulently offered and sold unregistered securities in the form of promissory notes purportedly secured by real estate."  (Compl.

-6-

¶ 1, ECF No. 1.)  As detailed above, the Complaint alleges that Koeller made "false and misleading statements and omissions of material facts" about the investments.  (*Id.* at ¶ 2.)  Further, the Complaint alleges that Koeller acted knowingly or at least recklessly.  (*Id.* at ¶¶ 92, 95.)

In the First Claim, the Complaint alleges that Koeller violated Section 17(a) of the Securities Act.  (*Id.* at ¶ 93.)  In the Second Claim, the Complaint alleges Koeller violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  (*Id.* at ¶ 96.)  Because the allegations in the Complaint are deemed true, it establishes that Koeller violated the cited securities laws.

### 3. Violations of the Registration Provisions of the Securities Laws

#### a. Sections 5(a) and (c)

The Complaint alleges that Koeller violated Sections 5(a) and (c) of the Securities Act. Under Section 5, securities cannot be sold to the public unless a registration statement is filed with the SEC.  (Pl.'s Mot. at 15, ECF No. 71-1.)   A violation of Section 5 occurs when:  (1) no registration statement is in effect for securities, (2) the defendant directly or indirectly sold or offered to sell the securities, and (3) means of interstate transportation or communication were used in connection with the offer or sale of such securities.  *SEC v. Sierra Brokerage Servs., In*c., 608 F. Supp. 2d 923, 938-39 (S.D. Ohio 2009). Requiring registration under Section 5 serves the purpose of "protect[ing] investors by promoting full disclosure of information thought necessary to informed investment decisions." *SEC v. Ralston Purina Co.*, 346 U.S. 119, 124 (1953). Since a party is strictly liable for a violation of Section 5, scienter is not a requisite element for finding that a violation occurred. *Sierra*, 608 F. Supp 2d at 939 (*citing SEC v. Calvo*, 378 F.3d 1211, 1215 (11th Cir. 2004)).

The Complaint establishes that Koeller violated Section 5.  It alleges that the securities IFAZ

offered were not registered.  (Compl. ¶¶ 1, 18, 20, ECF No. 1.)  Koeller and the other Defendants actively recruited members of the public to invest in IFAZ, and induced and/or attempted to induce the purchase or sale of investments in IFAZ.  (*Id*. at ¶ 28.)  Koeller and the other Defendants offered the securities.  (*Id*. at ¶ 98.)  While doing so, Koeller utilized means of interstate communication, namely, interstate telephone calls.  (*Id*. at ¶ 19.)  Because the allegations in the Complaint are deemed true, it establishes that Koeller violated Sections 5(a) and (c) of the Securities Act.

### b. Violation of Section 15(a) of the Exchange Act

The Complaint alleges that Koeller violated Section 15(a) of the Exchange Act.  Section 15(a)(1) of the Exchange Act makes it "unlawful for any broker or dealer . . . to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . . unless such broker or dealer is registered [with the Securities and Exchange Commission]."  *George*, 426 F.3d at 792 (quoting Section 15(a)(1)).  Section 15(a)(1) is violated when (1) a defendant, not registered as a broker or dealer under Section 15(b) of the Exchange Act, (2) makes use of the mails or means of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, securities.  However, Plaintiff is not required to prove the broker's scienter to establish a violation of Section 15(a).  *S.E.C. v. Martino*, 255 F.Supp.2d 268, 283 (S.D.N.Y. 2003).

To determine whether a defendant is a broker or dealer, the Sixth Circuit has stated that the following factors should be considered: "regular participation in securities transactions, employment with the issuer of the securities, payment by commission as opposed to salary, history of selling the securities of other issuers, involvement in advice to investors and active recruitment of investors." *George*, 426 F.3d at 797.  Consideration of these factors demonstrates that Koeller was a broker or

-8-

dealer under Section 15(a)(1). The Complaint alleges that "Koeller is not registered with the Commission in any capacity" and that he "acted as an unregistered broker from March 2009 until at least August 31, 2009."[1] (Compl. ¶ 15, ECF No. 1.) It also alleges that Koeller "frequently and actively recruited members of the public to invest in IFAZ, and [he] offered advice to such investors. [Koeller] thus induced and attempted to induce the purchase or sale of investments in IFAZ." (*Id.* at ¶ 28.) Because the allegations in the Complaint are deemed true, it establishes that Koeller violated Section15(a) of the Exchange Act.

## II.   LAW AND ANALYSIS

### A. Disgorgement

Disgorgement is a well-established remedy for violations of federal securities laws. *See SEC v. Blavin*, 760 F.2d 706, 713 (6th Cir. 1985); *Sierra*, 608 F. Supp. 2d at 968. In determining the proper amount of disgorgement, the Sixth Circuit has held that disgorgement of "the entire amount of profits which were illicitly received" is an appropriate remedy. *SEC v. Great Lakes Equities Co.*, 775 F. Supp. 211, 214 (E.D. Mich. 1991). A "reasonabl[e] approximation of profits causally connected to the violation" must be demonstrated by the SEC. *SEC v. First City Fin. Corp.*, 890

---

[1]       The Complaint alleges that Koeller was a registered representative with a broker-dealer until June 15, 2009, but was unsupervised by that broker-dealer with regard to his IFAZ sales. (Compl. ¶ 30, ECF No. 1.) Koeller testified that he was a registered representative with QuestStar and that he hid his work at IFAZ from QuestStar. (Koeller Dep. at 73, 83-86, ECF No. 71-3.) Because Koeller's work for IFAZ was conducted outside the scope of his position at QuestStar, that firm's registered status offers no registration protection for Koeller's IFAZ activities. *See Roth v. SEC*, 22 F.3d 1108, 1109-10 (D.C. Cir. 1994) (upholding SEC determination that if an individual is operating as a broker-dealer outside the course and scope of his employment, the employer's registration is not relevant). Thus, Koeller's activities were committed while not registered as a broker or dealer.

F.2d 1215, 1231 (D.C. Cir. 1989). Claims of "[f]inancial hardship do[ ] not preclude the imposition of an order of disgorgement." *SEC v. Thorn*, No. 2:01-cv-290, 2002 WL 31412439, at *3 (S.D. Ohio Sept. 30, 2002) (*citing SEC v. Inorganic Recycling Corp.,* No. 99 Civ. 10159, 2002 WL 1968341 at *2 (S.D.N.Y. Aug. 23, 2002)). Additionally, prejudgment interest on the disgorgement amounts has been recognized as a further remedy that prevents a defendant from "obtaining the benefit of what amounts to an interest free loan." *Sierra*, 608 F. Supp. 2d at 968 (*quoting SEC v. Moran*, 944 F. Supp. 286, 295 (S.D.N.Y. 1996)).

      The record establishes that Koeller received $87,379.19 in payments from IFAZ. First, the Complaint, which is deemed true for the purposes of this Motion, alleges that he received payments of at least $87,000 from IFAZ investor funds. (Compl. ¶ 90, ECF No. 1.) Second, Plaintiff has provided copies of the Koeller commission checks, which add up to $87,379.19. (Exhibit 2, ECF No. 71-4.) These checks were authenticated by Koeller at his deposition. (Koeller Dep. at 129, ECF No. 71-3.) Koeller also testified that he received commissions from IFAZ of 10% of the amount investors paid.[2] (*Id*. at 126-27.) Third, this amount was confirmed by Andrew Shirley ("Shirley"), an enforcement accountant for Plaintiff. He found, as stated in his declaration, that after review of the pertinent documents, including the checks made out to Velasquez from IFAZ, business bank account statements for IFAZ, and Koeller's personal bank statements, that Koeller received $87,379.19 in commissions. (Exhibit 3, ECF No. 71-5.) Shirley stated that he was able to verify that each of the checks to Velasquez cleared the IFAZ bank account and were deposited into Koeller's

---

[2]    Koeller arranged for his significant other, Emelda Velasquez ("Velasquez"), to receive his payments from IFAZ, in order to disguise his receipt of the funds. (*Id*. at 126-27, 83-85.) Although payments were made to Velasquez, they were payments Koeller received as commissions for selling investments. (*Id*. at 130-32.)

bank account within days of the date of the check.  (*Id.*)  Thus, these facts demonstrate that Koeller received $87,379.19 from IFAZ as commissions for selling securities to investors.

Plaintiff argues that the "entire amount of profits which were illicitly received must be disgorged."  *S.E.C. v. Great Lakes Equities Co.*, 775 F.Supp. 211, 214 (E.D. Mich. 1991).  However, Koeller maintains that this amount should be reduced by the $15,100 Velazquez invested in IFAZ and because of his poor financial condition. For the reasons that follow, the court does not find any of Koeller's arguments to be persuasive.

### 1. Discretionary Disgorgement

Koeller's argument that the ordering of disgorgement is discretionary is not well-taken.  The case Koeller primarily relies on, *SEC v. Merchant Capital, LLC*, 400 F.Supp. 2d 1336, 1373  (N.D. Ga. 2005), was appealed three separate times, and the Eleventh Circuit twice ordered the district court to order the appropriate amount of disgorgement.  *See S.E.C. v. Merchant Capital, LLC*, 397 F. App'x 593 (11th Cir. 2010).  The Eleventh Circuit stated that since the violations were "strict-liability violations, the district court is instructed to order appropriate disgorgement." *Merchant*, 397 F. App'x at 594.  Similarly, here, Koeller violated Sections 5(a) and (c) of the Securities Act, and Section 15 of the Exchange Act, which are strict-liability provisions.

Koeller cites to two other cases where courts made comments in dicta implying that courts have discretion over whether to order disgorgement.  However, in both of those cases, *In re Smith*, 365 B.R. 770 (Bankr. S.D. Ohio 2007) and *SEC v. Blackwell*, 477 F. Supp.2d 891 (S.D. Ohio 2007), the courts did order disgorgement.  Thus, the holding in those cases fail to provide support for Koeller's assertion that the court has discretion whether to order disgorgement.  In sum, the court concludes that disgorgement by Koeller is mandatory.

-11-

2. Reduction of Disgorgement for Velazquez's Losses

Koeller's disgorgement amount should not be reduced by Velazquez's losses.  Koeller did not invest in IFAZ.  Velazquez invested and lost $15,100 in IFAZ.  There is no reason to reduce Koeller's disgorgement amount because his companion lost money.  Even if it were his loss, rather than that of his significant other, it still would not warrant reducing the disgorgement amount.  *See George*, 426 F.3d at 786 (defendants were required to turn over the entire amount of their ill-gotten gains, with no deduction for the amounts they invested in the scheme); *SEC v. Seghers*, 298 F. App'x 319, 336 (5th Cir. 2008) (disgorgement would not be reduced by the amount of the defendant's losses).  If Koeller were given credit for the $15,100 investment, it would be the same as giving him 100% recovery on his losses to IFAZ, despite the fact that innocent victims of IFAZ stand to recover little, if anything. Therefore, disgorgement will not be reduced by Velazquez's losses.

3. Reduction of Disgorgement for Koeller's Financial Condition

Koeller argues that disgorgement should be reduced because he was not a willing participant in the fraud and because of his alleged financial condition.  First, as detailed above, the allegations in the Complaint are deemed true, which asserts that Koeller at least acted recklessly.  Thus, his argument about not being a willing participant is to no avail.  Second, the court finds that financial condition is not a proper consideration in computing disgorgement.  *See S.E.C. v. Free*, No.06-14891, 2011 WL 5143201, at *3 (E.D. Mich. Oct. 31, 2011) ("Unlike disgorgement, imposition of civil penalty requires a court to consider defendant's financial condition."); *Universal*, 646 F.Supp.2d at 565 ("In deciding a motion for disgorgement, a court is not bound to consider a defendant's claims of financial hardship."); *Inorganic,* 2002 WL 1968341 at *4 ("claims of poverty cannot defeat the imposition of a disgorgement order or civil penalty . . . . to withhold the remedy

-12-

of disgorgement or penalty simply because the swindler claims that she has already spent all the loot and cannot pay would not serve the purposes of the securities laws.") Although Koeller cites *S.E.C. v. Parrdue*, 367 F.Supp.2d 773, 778 (E.D. Pa. 2005), to support his contention that the court can reduce the disgorgement amount based on the defendant's financial condition, the court does not find this case to be persuasive.  The *Parrdue* court failed to cite any support for the conclusion it reached and is at odds with the above-cited case authority, which the court finds to be persuasive.

Nevertheless, even if the court had the benefit of persuasive authority that enabled it to consider Koeller's financial condition in determining the amount of disgorgement, Koeller fails to establish his inability to pay, as discussed below and more fully in Section B.  Although he indicates that he has limited income and significant expenses, he fails to adequately demonstrate it.  For example, in his Declaration, Koeller states that he filed personal bankruptcy in 2011 and that "[a] few years ago he had a substantial net worth and lost much of this in the real estate market." (Declaration at ¶ 6, ECF No. 75.)  Koeller also asserts that he "had substantial money that was exempt from creditors but liquidated exempt assets to take care of [his] contractual obligations and provide for [his] family. [He] now [has] a negative net worth."  (*Id.*)  However, Koeller fails to provide any support for these statements or any details about whether he has sufficient income to pay disgorgement.  He attaches a copy of his chapter 7 petition filed in early 2011, but the chapter 7 case has since been closed, and the other documents he has submitted do not reflect his current financial condition.   Therefore, disgorgement in the amount of $87,379 is proper.

Prejudgment interest should also be added to the amount of disgorgement.  First, Koeller consented to the awarding of prejudgment interest.  (Koeller Consent at ¶ 5, ECF No. 64-1.)  The Koeller Consent states that, "if disgorgement is ordered, Defendant shall pay prejudgment interest

thereon calculated from April 1, 2009, based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax set forth in 26 U.S.C. § 661(a)(2)."  (*Id.*) Second, prejudgment interest on the disgorgement amount has been recognized as a further remedy that prevents a defendant from "obtaining the benefit of what amounts to an interest free loan." *Sierra*, 608 F. Supp. 2d at 968 (*quoting SEC v. Moran*, 944 F. Supp. 286, 295 (S.D.N.Y. 1996)). Exhibit 4 shows the calculation of prejudgment interest, totaling $4,454.72, based upon the rate specified in the Koeller Consent.  (ECF No. 71-6.)  Therefore, Koeller is ordered to pay disgorgement in the amount of $87,379, plus prejudgment interest of $4,454.72, totaling $91,833.72.

## B. Civil Money Penalties

Civil money penalties are authorized by Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)(1)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. 78u(d)(3)(A)]. Because disgorgement is merely the repayment of any ill-gotten gains, the purpose of civil money penalties is to serve as a deterrent against future misconduct. *See SEC v. Conaway*, 697 F. Supp. 2d 733, 747 (E.D. Mich. 2010) (internal citations omitted). For a "third tier" violation of the securities laws, which involves "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons," 15 U.S.C. § 77t(d)(2)(C), the statutory penalty is $100,000 per violation or the gross amount of pecuniary gain resulting from the violation. 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B). The maximum penalty amounts were adjusted for inflation under the Debt Improvement Act of 1996, 17 CFR § 201.1003. For third-tier violations occurring after February 2, 2005, the maximum amount per violation is $130,000 or the gross amount of pecuniary gain, and for third- tier violations occurring after March 3, 2009, the maximum amount per violation

is $150,000 or the gross amount of pecuniary gain. *See* Table IV, 74 F.R. 9159-01, 2009 WL 506833 (F.R.) (March 3, 2009).

While the statutes provide guidelines for imposing a civil money penalty, the court has discretion to determine the appropriate amount of such penalty. The amount is "determined by the court in light of the facts and circumstances." 15 U.S.C. §§ 77t(d)(2)(A), 78u(d)(3)(B)(I). When determining the amount of a civil money penalty, the court should consider the following factors: "(1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition." *SEC v. Forest Resources Mgmt. Corp.*, No. 09 Civ. 0903, 2010 WL 2077202, at *2 (S.D.N.Y. May 18, 2010) (*quoting SEC v. Opulentica*, LLC, 479 F.Supp. 2d 319,331 (S.D.N.Y. 2007)).

Plaintiff requests the imposition of a civil money penalty against Koeller in the amount of his gross pecuniary gain, which is the amount of his commissions, $87,379.  Koeller argues that he should not have to pay any civil penalties given that he was an "unwilling participant" in the scam, he was an investor through his significant other, and because of his insolvency.  Koeller also argues that, because Plaintiff promised it would settle with him and the fact that the settlement amount for another defendant, Knitter, was significantly lower than his gross pecuniary gain, the court should reduce the amount of penalty he should pay or deny Plaintiff's request for imposition of a civil money penalty.

In analyzing the factors above, the court finds that the first four factors support the imposition of a substantial penalty. Koeller's conduct was egregious in two ways.  First, Koeller helped IFAZ

-15-

target retirees or retirement money. He suggested that IFAZ put advertisements in publications of a retirement community, where several of his previous clients lived. (Koeller Dep. at 116-17, ECF No. 71-3.) This conduct is egregious because Koeller encouraged investors to put their retirement money into an investment that Koeller was at least reckless in not knowing was based upon misrepresentations of material facts. Second, Koeller made outlandish misrepresentations and omissions. He represented to investors that their "[i]nterest is FDIC insured" and that "[y]ou earn 10% guaranteed without any risk to your principal." (Compl. ¶ 85, ECF No. 1.) These statements were false. (*Id*.)

As discussed above, he acted with ample scienter. Koeller was trained and experienced in the securities field, having worked in the securities business for more than ten years at the time he worked for IFAZ. (Koeller Dep. at 31-37, 47-49, ECF No. 71-3.) He also stated that he had received training in securities rules. (*Id*.) Therefore, he would have known he was breaking the law in offering securities that were not registered, that he was not registered to sell those securities, and that he was giving advice to investors without any support for his statements. Moreover, his scienter is further demonstrated by the fact that he tried to hide his conduct by using a false name and having his commissions paid to his significant other, conduct that he admits was wrong. (Koeller Dep. at 79-80, 83-85, ECF No. 71-3.) In addition, he worked to prevent his other employer from finding out that he was also selling securities for IFAZ. (*Id*. at 80-82.) Thus, Koeller acted with scienter.

Substantial losses were experienced by numerous people as a result of Koeller's conduct. Koeller testified that he spoke or communicated with about three hundred to six hundred people about investing in IFAZ. (Koeller Dep. at 155-56, ECF No. 71-3.) Koeller caused investors to invest hundreds of thousands of dollars in IFAZ, most of which was lost. Koeller identified several

IFAZ investors who invested through him and the amounts they invested.  (*Id*. at 186-88.)  He identified more than ten investors, who invested from $20,000 to over $250,000 each. (*Id*.)  Those investments total over $800,000.  (*Id*.)  Defendant Long testified that those investments became worthless.  (Long Dep. at 95, ECF No. 50-32.)  Thus, Koeller's conduct caused substantial losses to investors.

Koeller's conduct was not isolated, but recurrent.  He made numerous misrepresentations to many investors.  As discussed above, he spoke or communicated with about three hundred to six hundred people about investing in IFAZ.  (Koeller Dep. at 155-56, ECF No. 71-3.)  He accomplished this through e-mail and phone calls.

The fifth factor is whether the defendant's demonstrated current and future financial condition should result in a reduction in the penalty.  However, a mere contention of inability to pay is not sufficient to overcome the imposition of an appropriate penalty. *See Forest*, 2010 WL 2077202 at *2 ("claims of financial hardship-presented only in affidavits from defendants themselves, and not considering future earning capability–are insufficient to outweigh the appropriateness of a penalty"); *Inorganic,* 2002 WL 1968341 at *4 ("claims of poverty cannot defeat the imposition of a disgorgement order or civil penalty").  The burden rests with the defendant to demonstrate his inability to pay.   Plaintiff and Koeller spent considerable time exchanging information regarding financial information that might bear on Koeller's financial status before and after his bankruptcy filing.  (*See* Reply at 23, ECF No. 76; Mot. at 7, ECF No. 71-1.)  Ultimately, Plaintiff was dissatisfied with the information Koeller provided, indicating that he had failed to submit complete and truthful information.  Plaintiff provides two examples to illustrate Koeller's "dissembling about his financial status."  Plaintiff asserts that:

> First, Koeller submitted to the SEC sworn financial statements that failed to disclose that he had an active gambling account.  SEC staff happened to discover the account through an unidentified cash receipt in one of Koeller's bank accounts.  Other documents appeared to indicate that Koeller spent thousands of dollars in gambling expenses through the account.  In April 2011, the SEC asked about the gambling account.  Koeller responded by telling the SEC that he used the account "sparingly for some limited entertainment."  In addition, Koeller stated that "I have not gambled much over the last 5-6 years, **nor do I any more at this point in my life** other than some occasional lottery tickets." (Emphasis added.)   Contrary to his statements, a further review of Koeller's bank statements suggests that he had deposited money into his gambling account just three weeks before and two weeks after his statements to the SEC.
>
> Second, Koeller's sworn financial statement failed to disclose a credit union account that his [Velazquez] used to receive income and pay household expenses, even though Koeller was informed that he had to disclose all of [Velazquez's] assets.
>
> These are just two examples of the sort of dissembling by Koeller that made the SEC unsatisfied with Koeller's financial disclosures, and therefore unwilling to waive recovery of significant amounts from Koeller on the basis of his supposed inability to pay.

(Reply at 23-24, n.4, ECF No. 76.)  In light of their inability to reach a settlement, Koeller would have the burden of demonstrating to the court that he does not have the ability to pay a civil money penalty.  Koeller fails to overcome the showing put forth by Plaintiff that the requisite factors have been met and a civil money penalty should be imposed against him.  The information Koeller put before the court has not established a basis for the court to find an inability to pay.  In his Declaration, Koeller asserts that he has gone through bankruptcy and now has a negative net worth, but does not provide any bank accounts or anything else to the court regarding his assets, liabilities, or any other details upon which the court could assess the truthfulness of his assertions. (Ex. 2, ECF No. 75.)  He dwells on his exchanges with Plaintiff and the fact that it did not find there was sufficient information regarding his financial condition to reach a settlement.  In so doing, Koeller does not put forth any evidence before this court that he is unable to pay a civil money penalty.

Absolutely nothing is provided regarding his future inability to pay, which is clearly a factor in determining his ability to pay *any* penalty.  This is especially pertinent given that at one point he was a viable businessman, where he "built custom homes, did land development, and some house flipping."  (Declaration, Ex. 2, ECF No. 75.)  It would be pure speculation for the court to conclude that with a business background, Koeller would never be able to pay a penalty simply because of a current inability to pay.  In sum, despite arguing that he is insolvent as a basis for his inability to pay, the court finds that Koeller has failed to demonstrate such insolvency.  Thus, there is no basis to reduce the amount of civil penalty requested by Plaintiff to less than the amount of his gross pecuniary gain.

The court notes that this amount is far less than the maximum penalty of $130,000 per violation, as allowed by the  Securities and Exchange Acts, and as adjusted by the Debt Improvement Act of 1996.  With at least thirteen investors who lost money as a result of Koeller's conduct, assuming only one violation occurred per investor, Koeller could be penalized $1.69 million ($130,000 x 13 = $1,690,000). Ordering a penalty of his gross pecuniary gain, $87,379, is already a substantial reduction of the amount he could possibly owe.

Koeller's other arguments regarding why there should be no civil penalty against him or it should be reduced are also unavailing.  Koeller again seeks to have his significant other's investment in IFAZ credited toward any penalty that may be assessed against him.  However, *Koeller* did not invest this money, Velazquez did.   Therefore, it cannot serve as a basis to reduce any money he must pay.

Despite Koeller's assertions, Plaintiff was not required to reach a settlement with him.  The agreement signed by Koeller unequivocally states that Plaintiff may file a motion to have the court

-19-

determine the financial remedies, which it has done.  (Koeller Consent ¶ 5, ECF No. 64-1.)  The agreement also states that Koeller "represents that no threats, offers, promises, or inducements of any kind have been made by the Commission or any member, officer, employee, agent or representative of the Commission to induce Defendant to enter into this Consent."  (*Id*. at ¶ 8.) Therefore, Koeller is precluded from arguing that Plaintiff made any promise that would prevent it from seeking the instant financial remedies.  *See Universal*, 646 F. Supp. 2d at 565 (rejecting same argument on same basis).  Moreover, Plaintiff asserts it was unable to reach a settlement with Koeller because he was not willing to offer a substantial amount in settlement and his "financial disclosure was incomplete, false and otherwise suspect."  (Reply at 24, ECF No. 76.)

As to Koeller's argument that he should be given a penalty less than the amount of gross pecuniary gain in light of the fact that the settlement amount for Defendant Knitter was significantly lower than his gross pecuniary gain, it is also unpersuasive.  Plaintiff is not required to reach the same agreement with all Defendants in this case.  Further, Plaintiff asserts that Knitter's situation is not comparable to Koeller's circumstances because it found Knitter's "financial information to be sufficiently complete and credible to justify the SEC's agreement to waive significant amounts of recovery . . . . Koeller's submissions did not meet those standards."  (*Id*. at 25.)  Furthermore, the relief Plaintiff seeks against Koeller is significantly less than that imposed against Defendants Long and Paulic.  The court ordered disgorgement with prejudgment interest of over $1.5 million and a civil penalty of $1.481 million for Defendant Long.  (ECF Nos. 72, 73.)  The court ordered disgorgement with prejudgment interest of $624,887.65 and a civil penalty of $586,225 for Defendant Paulic.  (ECF Nos. 72, 74.)  These amounts are significantly greater than the amount sought by Plaintiff against Koeller, of $87,379.  Given the nature of Koeller's role, and the fact that

-20-

he has failed to demonstrate his insolvency, the court finds a civil money penalty to be appropriate and imposes a civil money penalty against Koeller in the amount of $87,379.

### III.  CONCLUSION

For the foregoing reasons, the court grants Plaintiff's Motion for Order Granting Financial Remedies to the SEC, and for Entry of Final Judgment Against Defendant Robert C. Koeller in its entirety.  (ECF No. 71.)  The court hereby orders:  (1) that Koeller is liable for disgorgement plus pre-judgment interest in an amount of $91,833.72; and (2) Koeller is liable for civil money penalties in the amount of $87,379.  The total amount imposed against Koeller is $179.212.72.

IT IS SO ORDERED.

/S/ SOLOMON OLIVER, JR.
CHIEF JUDGE
UNITED STATES DISTRICT COURT

January 20, 2012

-21-